IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| LORI E. KELLEN, | Case No. _____ |
| Plaintiff, | |
| vs. | **COMPLAINT AND JURY DEMAND** |
| CITY OF MADISON, a Political Subdivision, | |
| Defendant. | |

COMES NOW the Plaintiff, Lori E. Kellen, by and through her attorneys, and for her causes of action against the Defendant hereby states the following:

**<u>PARTIES-VENUE-JURISDICTION</u>**

1. Plaintiff Lori E. Kellen ("Plaintiff" or "Kellen") is an individual who resides in Madison, Nebraska. At all relevant times, Plaintiff was employed by Defendant City of Madison.

2. Defendant City of Madison ("Defendant" or "Madison") is a political subdivision of the State of Nebraska and conducts business within this District.

3. This Court has original jurisdiction over the claims arising under Federal law and concurrent jurisdiction over the state law claims. Jurisdiction of this Court is invoked pursuant to 28 U.S.C. Section 1331 and the Court's pendent claim jurisdiction under 28 U.S.C. §1367(a).

4. Venue is appropriate in this District under 28 U.S.C. §§1391(b) and (c).

5. On or about November 22, 2023, Kellen filed her first charge, NEB 2-23/24-11-53957-RS, with the Nebraska Equal Opportunity Commission ("NEOC"), alleging sex discrimination, retaliation and whistleblower retaliation. On that same day, Kellen's first charge was dually filed with the U.S. Equal Opportunity Commission ("EEOC") and assigned charge number EEOC 32E -2024-00149.

1

6.      On or about September 12, 2025, Kellen filed her second charge, NEB 1-25/26-9-55567-RS, with the NEOC alleging sex discrimination, retaliation and whistleblower retaliation. On that same day, Kellen's second charge was dually filed with the EEOC and assigned charge number 32E-2025-00682.

7.      On or about October 20, 2025, less than 90 days prior to the filing of this Complaint, Plaintiff received the NEOC's Determination with respect to Plaintiff's first charge, NEB 2-23/24-11-53957-RS.

8.      On or about December 18, 2025, less than 90 days prior to the filing of this Complaint, the EEOC issued a Notice of Right to on Plaintiff's first charge, EEOC 32E -2024-00149.

9.      Plaintiff has not received a Determination from the NEOC with respect to Plaintiff's second charge, NEB 1-25/26-9-55567-RS.

10.     Plaintiff has not received a Notice of Right to Sue from the EEOC on Plaintiff's second charge, 32E-2025-00682.

11.     Plaintiff is in the process of filling a third charge with the NEOC and EEOC related to her unlawful termination on December 10, 2025.

## FACTUAL BACKGROUND

12.     Kellen commenced employment with Defendant as the Deputy Treasurer on March 14, 2019.

13.     On or around April 2022, Kellen reported to the State Auditor that Jim Lewis, Defendant's City Utilities Superintendent, (hereinafter referred to as "Lewis") was using Madison's employees and property to build his own house, which she believed to be illegal.

14.     After Kellen reported this activity to the State Auditor's office, she began

experiencing harassment from Lewis, Lewis's family and friends, including the Mayor, Rob Fite, who is Lewis' son-in-law, and the City Councilmembers. Upon information and belief, this change in the council members' and Mayor's behavior towards Kellen was due to her report regarding Lewis's activity to the State Auditor's office.

15. On or about June 9, 2022, during lunchtime when Kellen was alone in the City office, Lewis came in and asked if she was going to "blackmail" him and Kellen responded that she didn't know what he was talking about.

16. On or around November 18, 2022, and again on December 7, 2022, Paula Biehle (hereinafter referred to as "Biehle"), a resident of Madison, a friend of the Lewis family and a supporter of Mayor Fite, named Kellen in a complaint to Madison, stating Kellen needed to reimburse taxpayer dollars for an alley paving project for a building that she thought Kellen owned at the time, but Kellen did not own it.

17. On December 12, 2022, after a city council meeting, Mayor Fite's wife and Lewis' daughter, Katie Fite, and Biehle were in the city building waiting for executive session to conclude. Kellen overheard them talking about Biehle's complaint and an attempt at recall proceedings for Kellen's husband, Paul Kellan. Paul Kellen was a council member who was seeking termination of Lewis's employment for his illegal conduct. Kellen walked out of her office to stand with her daughter, so her daughter did not feel uncomfortable around Katie Fite and Biehle.

18. Kellen heard Biehle say that Lewis and his employees should be paid to have to sit through "all this," and Kellen said that Lewis and his employees had already been paid. Katie Fite got in Kellen's face and asked her to repeat what she said. Kellen told her that she heard what Kellen said and that Kellen didn't want her daughter to have to listen to all of them. Kellen heard Biehle say "don't worry Katie, we're going to get them on the paving thing. They will get theirs."

3

19. On May 23, 2023, Kellen discovered that a camera in the city shop area where illegal activity (building the walls for Lewis' personal residence) had occurred was covered up, so Kellen reported this to the council members.

20. Following Kellen's report about the camera being covered, Mayor Fite harassed Kellen about the report by accusing her of watching the cameras all day, and had most, if not all of the cameras removed as a result.

21. Kellen felt that this took away from her safety as the cameras were installed for Madison employees' safety.

22. On June 14, 2023, Kellen attended the city council meeting and during executive session complained that she was being harassed and retaliated against for her report of Lewis' illegal activity and that the purpose of the retaliation and harassment was to make her quit. Kellen also complained that the removal of the cameras was a safety issue and asked that they be reinstalled in her office. The Council members agreed, but Mayor Fite never reinstalled the cameras.

23. On June 23, 2023, after Fite had the cameras removed, there was an inappropriate pornographic magazine left under the Kellen's office door, which caused Kellen to file a police report about it.

24. In late June 2023, a window in a building Kellen owned in Madison was broken out. The perpetrator was not found and Kellen believes it was further harassment against her as it was the only building on its block to have been damaged at the time.

25. On July 11, 2023, Kellen received an email from Abby Freudenberg (hereinafter referred to as "Freudenberg"), and Kelsie Smith (hereinafter referred to as "Smith"), both daughters of Lewis and sisters-in-law to Mayor Fite. The email claimed that Kellen

misappropriated funds by paying for an attorney using funds from the housing authority fund, which Kellen denies. Freudenberg and Smith also alleged that they were going to send a complaint to the State Attorney General.

26. On August 28, 2023, the Madison County Attorney met with Kellen regarding the harassment and retaliation she was receiving because of the illegal activity that she reported, and he sent a letter to the council members asking that the retaliation stop.

27. On August 30, 2023, the Madison County attorney and Council members met for a special meeting during which he asked for the harassment and retaliation against Kellen to stop.

28. On September 22, 2023, during a city council meeting, it was revealed that in Lewis's file, there were notes from a council member, which Kellen believed Mayor Fite put there as he made copies of the file. After confronting Mayor Fite about this, he called Kellen a liar.

29. In October 2023, the City had recently hired a new treasurer and at that month's city council meeting, Mayor Fite and the City Council voted to approve a raise for the new treasurer making her salary higher than Kellen's. The new treasurer was also given the position of Office Manager without a job posting or opportunity for Kellen to apply for the open position.

30. Kellen believes not offering her or allowing her to apply for the office manager duties given to the new treasurer was further retaliation because Kellen had more seniority and job experience than the person who was given the job.

31. On November 8, 2023, Kellen asked for an increase in her wage for the reasons stated above. Kellen was denied an increase in her wage, and Kellen believes that it was in retaliation for her complaints (internal, State Auditor, County Attorney and NEOC) about illegal activity, harassment and retaliation.

32. On or about December 5 2023, the Madison Treasurer, Teresa Hall, quit her

employment.

33. On or about December 13, 2023, Mayor Fites told Kellen he planned to reappoint her at the evening's City Council meeting, and then told Kelli Dickes, City Clerk, that he would not be reappointing her.

34. With Teresa Hall and Kelli Dickes both gone, Kellen was the only office staff member left in the Madison City Offices and was expected to take on their job duties until replacements were hired and trained.

35. On December 13, 2023, Mayor Fite took Kellen aside again for a second time that day to discuss the staffing issue. He told Kellen that he knew he put her in an impossible position and he would look into options to help Kellen.

36. At the December 13, 2023 Madison City Council meeting, Kelli Dickes and Jim Lewis were not reappointed to their positions.

37. On December 14, 2023, a letter was received from the Madison City Attorney's office stating that although Lewis was not reappointed, the City Council's consensus was that Lewis would be put on administrative leave without pay.

38. Upon information and belief, the City Council had not voted on the December 14, 2023 letter to Lewis, nor had they voted to suspend Lewis from employment, and it was Kellen's belief that the letter and employment status change contained in the letter were not valid because the city council had not voted on it.

39. On December 19, 2023, Mayor Fite told Kellen that he had spoken with council members and that they agreed she deserved a raise. He asked her if she would want the title of Office Manager, and she told him that she did not know what his expectations for the role were. He promised to discuss it with Kellen in the future.

40. During the December 19, 2023 City Council meeting, the Council voted to give Kellen a raise to $29.50 and promote her as "Interim Office Manager".

41. On December 20, 2023, Kellen processed the payroll. Kellen emailed the City Attorney, Michael Brogan for instructions on how to handle Lewis' payroll. If Lewis was no longer employed by the City, as seemed to be the case since the City Counsel had not reappointed him, the City needed to pay out certain benefits upon separation. If, however, Lewis was still employed by the City, but on unpaid administrative leave, the benefits should not be paid out. Brogan did not directly answer Kellen's inquiry about whether or not Lewis continued employment with the City, but instructed Kellen to pay out benefits, such as vacation.

42. Kellen believed that because Lewis was not reappointed, and she was instructed to pay out separation benefits, that she also needed to cancel Lewis' fringe benefits, such as his insurance. She canceled Lewis' insurance on January 2, 2024.

43. On January 2, 2024, Mayor Fite instructed Kellen to pay out Lewis's benefits in 3 separate payments. Kellen informed him that she had already paid everything out on Brogan's instructions. Mayor Fite responded by telling Kellen "You'd better hold onto that email."

44. On January 10, 2024, Lewis passed away.

45. Harassment against Kellen increased following Lewis' death, with many emails threatening litigation and investigations against Kellen for Lewis's death and canceling his insurance.

46. Since January 2024, Kellen has been and continued to be harassed, by several coworkers, including, but not limited to, Treasurer Wegener, City Clerk Tristan Plessel (hereinafter referred to as "Plessel"), and Police Chief Mike Hopen (hereinafter referred to as "Hopen"). Often when Kellen entered a room at the City offices, two or more of these people will

be standing together and whispering to each other in the office, and will stop when Kellen enters the room.

47. In February 2024, Kellen opposed violations of the law and refused to participate in illegal activity when Kellen was asked by the new Treasurer, Amy Wegener (hereinafter "Wegener") to pay Lewis's wages after he was not reappointed. Kellen explained to Wegener that Lewis had not been reappointed, so it would be untruthful and fraudulent for her to say that he was an employee or that Kellen had made a mistake in canceling his insurance benefits.

48. On or about May 15, 2024, a new pay scale was adopted by Madison. Per the adopted pay scales, Kellen should have received a rase of $1.73 per hour for the "Interim Office Manager" position that had been given to her in December 2023. Kellen did not receive the raise.

49. As part of Kellen's job duties, Kellen attended the September 2024 City Council meeting, during which Mayor Fite's family and Councilmember Ainsworth's family harassed Kellen and her daughter. At that meeting, they waved and smiled at Kellen, threatened her, blocked her exit from the building and told her, "You got yours."

50. Mayor Fite's family and Councilmember Ainsworth's family also physically harassed Kellen's daughter in front of Kellen by grabbing her bag, restraining her in a chair and getting in the passenger seat of her car, yelling and threatening her. The Mayor and Councilman did nothing to protect Kellen or others. When Kellen asked the police chief why he didn't intervene, he said that he "wasn't picking sides."

51. In October 2024, Treasurer Wegener and Clerk Plessel had not been working their hours and had been paid vacation time exceeding their accruals. The work they were not able to complete due to their reduced schedules fell on Kellen and felt retaliatory. This issue was addressed at the October 2024 council meeting, but nothing was done.

52. After the October 2024 public meeting, Kellen was asked to come back into the Council Chambers by Biehle about a complaint she had with Kellen. The proposed meeting was not on the agenda and would have violated the Open Meeting Act. When Kellen realized what was happening and prudently left, the quorum of council members and Biehle continued to talk about Kellen.

53. During November 2024, elections were held and Beihle was elected to the Madison City Council.

54. Kellen received an email from Mayor Fite in December 2024 informing her that he was taking the Interim Office Manager position from me and appointing Treasurer Wegener as the office manager. No explanation was given for the decision.

55. Upon information and belief, the increased wage and office manager duties given to the treasurer were further retaliation against Kellen.

56. In or around the end of January 2025, Kellen discovered that Madison had also reduced her pay effective December 14, 2024, from $30.54 to $28.66. Not only did the pay decrease not go through City council for a vote, Kellen was not informed of this pay decrease.

57. Kellen has been and continues to be subjected to different terms and conditions of employment by Madison.

58. In January 2025, Mayor Fite informed her that there was no longer any room for her to sit up front with the other appointed officials during meetings anymore, so Kellen had to sit in the audience. Kellen is the only city employee required to attend that does not sit up front, other than the police chief. Kellen had been sitting up front at city council meetings for a year prior without issue. Madison even added another table up front, adding more room, while claiming there was no longer any room for her.

59. Sometime in February 2025, Madison excluded Kellen from a city council workshop where appointed officials and department heads met to discuss their departments and upcoming needs.

60. By reducing her pay and eliminating those duties, Madison effectively demoted Kellen. Even with her demotion and reduced pay, Kellen was still doing tasks that are the responsibility of the other office staff because they are permitted to take time off in excess of what the City policies permit. Upon information and belief, Mayor Fite is allowing the office staff to break the rules because it increases Kellen's workload and Fite, and others want her to quit.

61. On or about June 17, 2025, Kellen asked Wegener directly if they had something personal against Kellen. Wegener admitted they were talking about Kellen, and about things that had been discussed about Kellen during executive sessions during city council meetings, but it was nothing that could be discussed with Kellen.

62. On November 5, 2025, Kellen reported the issues with Wegener and Plessel not working their contracted hours during an annual audit. Kellen informed the city auditor, Michael Hoback, that the issues had been brought up to Mayor Fite and the City Council repeatedly.

63. On December 10, 2025, Kellen was contacted by Madison's human resources department. She learned that they received a complaint from someone that felt she was discriminatory while discussing an unpaid city utility bill and payment arrangments with the customer/citizen. After discussing the issue with human resources, Kellen realized she was not at work on the day of the incident and Wegener had been the person this customer/citizen had been in contact with.

64. Kellen told Wegener the customer/citizen made a complaint over his treatment, and emailed human resources to let them know she had discovered the payment agreement was in Wegener's handwriting and written on a day that Kellen was not at work.

65. Kellen knows that Wegener knows the customer/citizen and that he knows who Wegener is because when he comes into the city offices, he always greets Wegener by her first name.

66. On December 10, 2025, the City Council voted to not reappoint Kellen.

67. Prior to her discharge, Plaintiff's job performance was above satisfactory.

68. At the time of her termination, Plaintiff was earning approximately $59,612.80 a year plus benefits working full time hours for Defendant. As part of her compensation, Plaintiff also was eligible to receive health, dental, and vision insurance, retirement benefits, short term and long-term disability, accidental death and life insurance benefits in amount that is currently unknown to Plaintiff and will be subject to further discovery. As of the date of this filing, Plaintiff's lost wages resulting from Defendant's wrongful conduct are in excess of $10,100.00 and are continuing.

69. As a result of Defendant's wrongful conduct, Plaintiff suffered lost wages, compensatory damages, including emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and has also incurred attorney's fees and other costs that are continuing.

## COUNTS I & II

### SEX DISCRIMINATION

### 42 U.S.C. § 2000e-2 and Neb. Rev. Stat. §48-1004

70. Plaintiff hereby incorporates paragraphs 1 through 69 as if fully set forth herein and states:

71. Defendant discriminated against Plaintiff with respect to terms and conditions of her employment on the basis of her sex in violation of Title VII and the NEFEPA by treating her differently than similarly situated male co-workers.

72. Plaintiff suffered adverse action including but not limited to harassment, discipline, less desirable and denial of job responsibilities, increased scrutiny of her performance and discharge.

73. Plaintiff's sex was a motivating factor in the decision-making regarding Plaintiff's terms and conditions of employment.

74. As a result of Defendant's acts and omissions, Plaintiff has in the past and will in the future suffer damages including, but not limited to, mental and emotional distress; fear; anguish; humiliation; embarrassment; lost enjoyment of life; lost wages, benefits, future earnings, and other emoluments of employment.

## COUNT III

### RETALIATION

### Neb. Rev. Stat. §48-1004

75. Plaintiff hereby incorporates paragraphs 1 through 74 as if fully set forth herein and states:

76. During her employment, Plaintiff engaged in protected activity, including but not limited to exercising her rights of internally complaining of sex discrimination, participating in other employees's (Kelli Dickes) internal complaints.

77. Defendants took adverse employment action against Plaintiff, including but not limited to subjecting her to harassment, discipline, less desirable and denial of job responsibilities, increased scrutiny of her performance and discharge.

78. There is a causal connection between Plaintiff's participation in protected activity and Defendant's adverse action against her.

79. As a result of Defendant's retaliation, Plaintiff has in the past and will in the future suffer injuries and damages, including, but not limited to mental and emotional distress; humiliation; fear, embarrassment; lost enjoyment of life; lost wages and benefits; front pay and other emoluments of employment.

## COUNT IV

### WHISTLEBLOWER RETALIATION

### Neb. Rev. Stat. §48-1114

80. Plaintiff hereby incorporates paragraphs 1 through 79 as if fully set forth herein and states:

81. Defendant was at all times material an "employer" within the meaning of Neb. Rev. Stat. §48-1102.

82. During her employment, Plaintiff engaged in protected activity, including but not limited to reporting and opposing illegal activity, criminal conduct, and violations of state law.

83. Defendant took adverse employment action against Plaintiff, including but not limited to subjecting her to harassment, discipline, unfavorable work assignments, subjecting her job performance to higher scrutiny than others and constructive discharge.

84. There is a causal connection between Plaintiff's participation in protected whistleblower activity and Defendant's adverse action against her.

85. As a result of Defendant's retaliation, Plaintiff has in the past and will in the future suffer injuries and damages, including, but not limited to mental and emotional distress;

humiliation; fear, embarrassment; lost enjoyment of life; lost wages and benefits; front pay and attorney's fees.

## COUNT V

## WRONGFUL TERMINATION IN VIOLATION

## OF NEBRASKA PUBLIC POLICY

86. Plaintiff hereby incorporates paragraphs 1 through 85 as if fully set forth herein and states:

87. Defendant was at all times material an "employer" within the meaning of Nebraska common law.

88. During her employment, Plaintiff engaged in protected activity, including but not limited to reporting and opposing illegal activity, criminal conduct, and violations of state law.

89. Defendant took adverse employment action against Plaintiff, including but not limited to subjecting her to harassment, discipline, less desirable and denial of job responsibilities, increased scrutiny of her performance and discharge.

90. There is a causal connection between Plaintiff's participation in protected activity and Defendant's adverse action against her.

91. As a result of Defendant's wrongful conduct, Plaintiff has in the past and will in the future suffer injuries and damages, including, but not limited to mental and emotional distress; humiliation; fear, embarrassment; lost enjoyment of life; lost wages and benefits; front pay and attorney's fees.

## DAMAGES

92. Plaintiff hereby incorporates by reference paragraphs 1 through 91 and states:

93. As a result of Defendant's discrimination, retaliation and other wrongful conduct,

Plaintiff has suffered damages and seeks the following relief:

    a. Back pay and lost benefits to the time of trial;

    b. Front pay including retirement and other benefits;

    c. Federal and state income tax gross up to offset increased tax liability for lost wage award;

    d. Compensatory damages for future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses;

    e. Attorney's fees, expert witness fees and other reasonable costs; and,

    f. Pre-judgment and post judgment interest.

WHEREFORE, Plaintiff demands judgment against Defendant in an amount which will fully and fairly compensate her for her injuries and damages, for all her general, special, and punitive damages, for costs, attorney's fees, interest and for such other relief as just and equitable.

Plaintiff demands a trial by jury.

Dated: January 16, 2026.

    LORI E. KELLEN, Plaintiff

BY:   s/ Jennifer Turco Meyer
       Jennifer Turco Meyer, 23760
       Turco Meyer Law, LLC
       4309 South 174th Avenue
       Omaha, Nebraska 68135
       (402) 577-0252
       jennifer@turcomeyer.law
       Attorney for Plaintiff